FILED

03/24/2025

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 4, 2024 Session

## BRANDY LEIGH FRAME TAYLOR (NOW TIPPER) v. JOSEPH DANIEL TAYLOR

**Appeal from the Circuit Court for Lincoln County**
**No. 16-CV-123      J. B. Cox, Chancellor[1]**

_____

**No. M2024-00045-COA-R3-CV**

_____

This post-divorce appeal arises from competing petitions to modify a parenting plan and a petition for criminal contempt. At the time of the divorce, Brandy Leigh Frame Taylor[2] ("Mother") and Joseph Daniel Taylor ("Father") adopted a parenting plan naming Mother the primary residential parent of the parties' minor child and awarding Father visitation. The child was four years old at the time of the divorce. Five years later, the then nine-year-old child purportedly began refusing to visit Father. Thereafter, Mother petitioned the trial court to modify the parenting plan to, *inter alia*, stop all visitation with Father. Father filed a counter-petition to modify the parenting plan to, *inter alia*, name him the primary residential parent. Father also filed a contempt petition alleging, in relevant part, that Mother intentionally and repeatedly obstructed his visitation and coached the child to refuse to visit Father. After a two-day hearing in which the trial court found Father was a credible witness and Mother was not credible, the court determined that a material change in circumstances had occurred due to Mother's severe alienation of the child from Father and that a drastic modification of the parenting plan was in the child's best interest. The court's modifications of the parenting plan included designating Father as the primary residential parent with sole decision-making authority, reducing Mother's parenting time to what Father had been awarded in the previous order, and restricting Mother to supervised visitation pending a Tennessee Rule of Civil Procedure 35 psychological evaluation. In a separate order, the court found Mother guilty of seventy-one counts of criminal contempt for willfully violating the parties' visitation schedule and sentenced Mother to serve concurrent ten-day terms in jail for six of the seventy-one acts of contempt but suspended the sixty-day sentence except for the service of three weekends on the condition that Mother strictly adhere to the court's orders going forward. Mother appeals the modification

---

[1] Chancellor Cox was sitting by interchange after the circuit court judge, Wyatt Burk, recused himself.

[2] Brandy Leigh Frame Taylor subsequently remarried and is now Brandy Leigh Frame Tipper.

of the parenting plan and the trial court's seventy-one criminal contempt findings. Both parties challenge the sentence imposed for Mother's criminal contempt. We affirm. Father also requests his attorney's fees on appeal. We find Father's request to be well taken and remand for a determination of Father's reasonable and necessary attorney's fees incurred in this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined

Jonathan William Turner and Matthew Jared Crigger, Franklin, Tennessee, for the appellant, Brandy Leigh Frame Taylor (now Tipper).

Pat M. Fraley, Fayetteville, Tennessee, for the appellee, Joseph Daniel Taylor.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On April 19, 2017, Mother and Father were divorced by final decree of the Circuit Court of Lincoln County. The parties had one child during the marriage, Case Taylor, ("the Child") born in March of 2013.

The final decree incorporated the parties' marital dissolution agreement ("MDA"), permanent parenting plan ("the Parenting Plan"), and child support worksheet. Pursuant to the Parenting Plan, Mother was designated as the primary residential parent, and Father was awarded visitation. The residential parenting schedule allocated 241 days to Mother and 124 days to Father. Father was awarded visitation with the Child every Wednesday at 4 P.M. until Thursday at 8 A.M. and every other weekend from Friday at 6 P.M. to Sunday at 6 P.M. He was awarded two non-consecutive weeks of visitation during the summer and alternating holidays and school breaks. The exchange of the Child was to occur at Kid's Park in Fayetteville, Tennessee. Father's child support obligation was set at $679.00 per month. The parties were awarded joint decision-making responsibilities regarding educational and extracurricular activities; however, Mother was awarded sole decision-making responsibilities regarding non-emergency health care and religious upbringing.

For approximately five years following the divorce, the parties adhered to the Parenting Plan without issue. This changed in October 2022 when Mother, her mother, "Nana," and Mother's husband, Brent, began encouraging and coaching the Child to refuse to visit Father.

Beginning on October 6, 2022, Mother would bring the Child to the exchange location for Father's weekly visitation, where Father or his mother would be waiting to receive the Child. Each week upon arrival, the Child would become hysterical and would refuse to get out of the car. Mother, who apparently believed that the Child had been harmed while staying at Father's home, would then turn her car around and take the Child back to her home. This scenario occurred repeatedly, a total of seventy-one times, between October 6, 2022 and the first date of trial on October 24, 2023.

On January 12, 2023, Mother filed a petition to modify the Parenting Plan.[3] Mother alleged that a material change in circumstances had occurred since the entry of the Parenting Plan in April 2017; specifically, that the Child had developed severe anxiety surrounding visitation with Father, becoming nauseous, hysterical, and suffering panic attacks during the exchange. She further claimed that the Child had disclosed to a counselor that Father and his step-mother had hit and physically abused him, including locking him in his room, and that the Child had attempted to run away from home multiple times during Father's visitation time. For these and other reasons, Mother requested that the court suspend Father's visitation and award her full custody of the Child with sole decision-making responsibility.

In February 2023, upon Father's request, the court appointed a guardian ad litem to represent the interests of the Child. On February 24, 2023, Father filed a response denying Mother's allegations and a counter-petition to modify the Parenting Plan. Father alleged that a material change in circumstances had occurred because, *inter alia*, Mother had violated the Parenting Plan by discussing the parties' case in front of and/or with the Child and failing to encourage visitation with Father. Father requested that the Parenting Plan be modified to, namely, designate him as the primary residential parent, award Mother "residential parenting times with the parties' minor child at reasonable times, hours and places and upon giving Father at least seventy-two (72) hours' notice," and require Mother to pay child support and arrearages.

Father also petitioned for Mother to be held in criminal contempt for willfully violating the Parenting Plan by "discussing the parties' case with the minor child and/or in the presence of the minor child in three ways[,]" "fail[ing] to encourage visitation of the minor child with his Father since Father has not visited regularly since **August, 2022**, or at all since **October, 2022**[,]" and "fail[ing] to engage in a full and complete discussion and a joint decision-making agreement with the Father." (emphasis in original).

---

[3] The Child was two months shy of being ten years old when the petition was filed and was ten years old when the case was tried.

Mediation was held in August 2023, but was unsuccessful, and the case was set for final hearing. During the two-day bench trial held October 24 and November 22, 2023,[4] the trial court heard testimony from Mother, Father, and the Child. For his part, Father testified that either he or his mother had appeared at the exchange location seventy-one times since October 6, 2022 but had not received the Child. Father's testimony was supported by records showing seventy-one times the Child had not visited as of the first date of trial. Father further testified that Mother had reported him to the State of Tennessee Department of Children's Services ("DCS") three times,[5] but that each report had been classified by DCS as unfounded, and that he had not been permitted to participate in counseling with the Child's current counselor.[6] Father also introduced the Child's counseling records from (1) Luminous Counseling & Consulting LLC, (2) Junior's House Child Advocacy Center, and (3) Joseph W. Self, Licensed Marriage and Family Therapist, which were admitted into evidence.

Mother testified next. Mother acknowledged that she understood and had the ability to obey the court's orders; however, she stated four times that she could not and would not do so, insisting that the Child had been harmed while at Father's and that she "ha[d] to protect him." Mother had previously testified to this effect four times during her deposition.[7] Mother stipulated to the records showing that the Child had not visited with Father seventy-one times since October 6, 2022, that she had reported Father to DCS three times, and that all three referrals had resulted in "unfounded" findings by the department.

Upon taking the stand, the Child volunteered that he was there because he wanted to stay with Mother. The Child testified that he did not feel safe at Father's because he had to sleep in a room with one light which was "scary," but denied having been locked in a room at Father's or having run away from home. The Child testified that Mother does not encourage him to go to Father's. When shown pictures of activities with Father and his immediate family, the Child covered his eyes and began to cry, repeating that they were "mean." The Child stated "I didn't want to swap houses. I want to be a normal kid. Brent and Nana told me I wouldn't have to go. Mama was there."

---

[4] Because there was no court reporter at trial, both parties submitted statements of the evidence. On April 9, 2024, the court held a hearing to resolve conflicts in the competing statements of the evidence. Shortly thereafter, the trial court filed its own statement of the evidence.

[5] The reports were for "marks on [the Child's] arm," chigger bites, and locking the Child in his room, which DCS found was impossible because the door to the Child's room could only be locked from the inside.

[6] Father's attorney introduced the DCS reports at trial, which were also admitted into evidence. Father testified regarding the three DCS investigations, and Mother admitted on the stand that she had reported Father to DCS three times.

[7] Mother's deposition was made an exhibit and referenced during her testimony.

Following trial, on December 28, 2023, the trial court issued a memorandum opinion.[8] Therein, the court made numerous findings of fact relating to the issue of modification of the Permanent Parenting Plan, including the following:

1. Since the entry of the Permanent Parenting Plan, Case Taylor, the only child of Mother and Father, has not visited with Father for over a year.

2. Father or his agent has faithfully shown up at the exchange location to receive the child for visitation.

3. Mother has not turned over the child for visitation.

4. No court order relieved Mother from making the child available for visitation with Father.

5. The child has hidden in the floorboard of the automobile and refused to go with Father.

6. The child had thrown fits, hid at the house, and refused to go to Father's for visitation.

7. Mother has never told the child that he must go with Father.

8. The child has never been disciplined in any form or fashion for his conduct surrounding his refusal to visit with Father.

9. Mother testified that she just couldn't make the child go as she was convinced that something had happened to the child at Father's.

Based on the above and other findings of fact, the court determined that a material change in circumstances had occurred due to Mother's systematic and purposeful alienation of the Child from Father. As the trial court reasoned:

Mother has systematically and purposefully kept the child from Father. She hides behind the fact that she shows up at the exchanges, but what is occurring in this case is clear. Mother is systematically alienating the child from Father. She has done this by not making the child visit with Father. She has done this by seeking out a counselor that will willfully exclude Father

---

[8] The memorandum opinion and Parenting Plan with attached child support worksheet were "ratified, approved, confirmed and made the Decree of the Court" by final order entered January 9, 2024.

from the process. She has done this by allowing people in her circle to tell the child that whether the child visits with Father is always the child's choice. Her approach to laying all of this on the child is problematic. She doesn't say you have to go with your Father. She allows the child to throw fits, refuse to go with Father, and then have no negative consequences for his inappropriate behavior. Amidst all of this she wants to argue the excuse of "I just can't make him."

This portrait of inappropriate enabling and alienation of affection has repeated itself for over a year at the exchange point, all the while empowering the child and reinforcing his belief that he is in control of the situation. This conduct is not inconsistent with Mother's mode of operation. The older child in Mother's home does not see her Father. In this case, Father testified that Mother made him choose between her and his child by another mother. The Court finds Father's testimony credible. The Court further finds Mother's excuses unavailing and incredible.

Early records from Junior's House [the Child's previous counseling center] reveal that this child has been the subject of long-term coaching. This hypothesis is bolstered by the child's own testimony when he revealed that members of Mother's household told him what to say, and if he said certain things that he would never have to see Father again. This Court believes that the child was coached in this way and can logically infer that this was accomplished with Mother's full acquiescence. In its time on the bench, this Court has never seen such a clear-cut case of parental alienation. Mother never made the child visit with the Father. She turned him in to DCS three times without any real reason. She refuses to believe that there has not been abuse at Father's house, when there has clearly never been abuse at Father's house. She has never imposed any consequences on the child for his refusal to go. She has allowed other members of her family, the Court is convinced that this has occurred with her knowledge and approval, to convince the child that all he had to do was say and do certain things and he would never have to go to Father's again. Mother has shut Father out from the doctor and the counselors. When a counselor figured out that the child was being coached, she switched counselors. When a counselor was about to get Father involved, Mother switched counselors.

Having determined that a material change in circumstances had occurred, the court considered the best interest factors set forth in Tennessee Code Annotated § 36-6-106(a), finding that several of the factors had been skewed by Mother's parental alienation and that the factors as a whole weighed in favor of drastically modifying the Parenting Plan in Father's favor. Accordingly, the court concluded that it was in the Child's best interest to grant Father's petition to modify. The court modified the Parenting Plan by, *inter alia*, (1)

designating Father as the primary residential parent with sole decision making authority for the Child, (2) reducing Mother's parenting time to what Father had been awarded in the prior order provided that the Child have no contact with the members of her family that coached him for his testimony, and (3) limiting Mother's parenting time to supervised pending a Tennessee Rule of Civil Procedure 35 psychological evaluation.

On the same day, the trial court entered a separate order on contempt in which it found Mother guilty on seventy-one counts of criminal contempt for willfully violating the parenting plan by not making the Child share residentially with Father. The court sentenced Mother to serve concurrent 10-day terms in jail for six of the seventy-one contempt counts but suspended the 60-day sentence except for the service of three weekends on the condition that Mother strictly adhere to the court's orders going forward. The court ordered Mother to serve her sentence during the first three weekends of January 2024.[9] The court also ordered Mother to pay Father's attorney's fees related to the contempt portion of the proceedings.

This appeal followed.

### ISSUES

Mother presents four issues on appeal:

1. Whether the trial court erred in ordering a change in custody upon finding that mother's conduct alienated the parties' son from the father, but where the guardian ad litem advocated for ramped up visitation for the father and counseling and the court was not assisted by any expert testimony.

2. Whether the trial court erred in indefinitely limiting the mother to supervised visitation without making specific findings of the likelihood of harm to the child and without the aid of expert testimony.

3. Whether the trial court erred in finding mother in criminal contempt on seventy-one counts, where the petition only made three general allegations of contempt and mother made some efforts to comply with the visitation schedule.

4. Whether the trial court's sentence for criminal contempt, including jail time, was excessive.

Father raises two additional issues, which we restate slightly: (1) whether Mother's sentence for criminal contempt was sufficiently severe and (2) whether Father is entitled

---

[9] On January 4, 2024, Plaintiff filed a motion to stay the custody and contempt orders pending the resolution of this appeal. The trial court thereafter stayed the order on contempt.

to his attorney's fees and costs incurred on appeal.

Determinations regarding custody and visitation "often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Trial courts necessarily have broad discretion to make decisions regarding parenting arrangements to suit the unique circumstances of each case. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citing *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Id.* at 88. Thus, a trial court's decision as to the details of a parenting plan will not ordinarily be reversed absent some abuse of discretion. *Id.* at 85 (quoting *Suttles*, 748 S.W.2d at 429).

"'A trial court's use of its contempt power is within its sound discretion and will be reviewed by an appellate court under an abuse of discretion standard.'" *State ex rel. Groesse v. Sumner*, 582 S.W.3d 241, 250 (Tenn. Ct. App. 2019) (quoting *McLean v. McLean*, No. E2008-02796-COA-R3-CV, 2010 WL 2160752, at *3 (Tenn. Ct. App. May 28, 2010)). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that caused an injustice. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

### I.   MODIFICATION OF THE PARENTING PLAN

Mother contends on appeal that the trial court erred in modifying the Parenting Plan by designating Father as the primary residential parent and restricting her to supervised visitation pending a Tennessee Rule of Civil Procedure 35 mental evaluation. Father disagrees.

It is well established that "a custody decision, once made and implemented, is considered res judicata upon the facts in existence or those which were reasonably foreseeable when the decision was made." *Rigsby v. Edmonds*, 395 S.W.3d 728, 735 (Tenn. Ct. App. 2012) (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)). A trial court may modify custody however "'when both a material change of circumstances has occurred and a change of custody is in the child's best interests.'" *Id.* (quoting *Kendrick v. Shoemake*, 90 S.W.3d 566, 568 (Tenn. 2002)). Because Father petitioned the court to modify the parenting plan to designate him as the primary residential parent rather than Mother, this action is considered one for modification of "custody." *See McClain v.*

*McClain*, 539 S.W.3d 170, 187 (Tenn. Ct. App. 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 703 (Tenn. 2013)).

A petition to modify custody invokes a two-step analysis. *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007). As a threshold issue, trial courts must determine whether there has been a material change of circumstances since the entry of the prior order. *Id.* (citing *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R-CV, 2006 WL 2505037, at *7 (Tenn. Ct. App. Aug. 29, 2006)). Material changes may include "failures to adhere to the parenting plan or an order of custody and visitation." Tenn. Code Ann. § 36-6-101(a)(2)(B).

If a material change in circumstances has occurred, a trial court must proceed to the second step of the analysis and apply the statutory "best interest" factors enumerated in Tennessee Code Annotated § 36-6-106(a) to determine whether modification is in the child's best interest.[10] *Armbrister*, 414 S.W.3d at 705.

---

[10] The version of Tennessee Code Annotated § 36-6-106 in effect at the time the instant action was commenced provided in relevant part:

> (a) In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:
>
> > (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> >
> > (2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;
> >
> > (3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules;

(15) Any other factors deemed relevant by the court; and

(16) Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more.

Whether a material change of circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. *Id.* at 692–93 (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). We review a trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* at 692 (citing Tenn. R. App. P. 13(d); *Kendrick*, 90 S.W.3d at 570); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984)).

Mother does not dispute that there has been a material change of circumstances since the entry of the Parenting Plan, noting in her appellate brief that "it was undisputed that the child missed seventy-one weekends with his father and this was material and surely not contemplated by the original parenting plan." Mother avers, however, that the trial court improperly weighed the best interest factors contained in Tennessee Code Annotated § 36-6-106(a) by discounting the factors that it found were skewed by parental alienation, but that otherwise would have weighed in her favor. She further contends that a full change of custody from her to Father was "too drastic a remedy" and that a more appropriate remedy would have been increased counseling and visitation with Father as recommended by the GAL.

In its memorandum opinion, the trial court identified the best interest factors it considered relevant and in whose favor those factors weighed. While the court found that the Child had a stronger relationship with Mother (factor one), that Mother was the primary caregiver (factor five), and that the Child has greater love and affection towards Mother (factor six), it determined that these factors had been skewed by Mother's alienation of the Child from Father and declined to accord them any weight. More specifically, as for factor one (the strength of the relationship with each parent), the trial court found that it "gives this factor no weight" because although Mother performed most of the parenting responsibilities, "she has done this in an attempt to sever the Child from Father altogether." As for factor five (primary caregiver), the court found that, "[f]acially, this factor would favor Mother. However, given Mother's attempts to alienate the Child Father, the court gives it no weight." While the trial court did not explicitly state that it was according "no weight" to factor six (love, affection, and emotional ties between each parent and child), the court repeated that the Child only has greater love and affection towards Mother because she has alienated him from Father.

Of the remaining factors, the court found that six weighed in favor of Father, two favored neither parent, and five were inapplicable. With respect to the parties' potential for future performance of parenting responsibilities, including the willingness and ability to encourage a relationship between the Child and both parents (factor two), the trial court found:

---

Tenn. Code Ann. § 36-6-106(a)(1)–(16) (Effective March 18, 2022 to April 22, 2024).

Mother has a demonstrated ability to parent the child. Which is what she desires to do, alone. She is incapable of co-parenting the child. She will not and has not for over a year promoted or facilitated a close and continuing relationship between Father and child. Instead, she has turned Father in to DCS three times and allowed a year to go by without the child seeing Father. She will not and has not followed the Orders of the Court and will likely not do so in the future, given her testimony, which the Court finds patently unreasonable, that something has occurred at Father's home. Father, to his credit, has never given up on this child, although his willingness to give up on an older child is a concern for the Court. This factor heavily favors Father. The Court gives it great weight. The actions of Mother to thwart the present parenting plan, her disobedience of the Court's Orders, and her attitude toward ever cooperating with Father, show her true intentions.

The court expressed concern regarding Mother's mental and emotional fitness to parent given the lengths she had gone to alienate the Child from Father and found that Father is currently more fit to parent the Child (factor eight). The court found that Mother's actions had precluded the Child from interacting with his siblings and stepsiblings (factor nine) and that Mother's environment (factor ten) was "poisonous" because it "teaches children that they can be disobedient to authorities, throw fits and get their way, elude punishment for inappropriate behaviors, and they don't have to have a relationship with their other parent."

While the record contained no evidence of physical or emotional abuse requiring the case to be transferred to the juvenile court (factor eleven), the court remarked that "[t]he abuses here are more insidious. Father has cleared his name three times and Mother still believes he has done something to the child. She has withheld him from Father for a year without cause under the excuse of 'I can't do it anymore.'" The court also expressed concern regarding the behavior of Mother's husband, Brent, and the maternal grandmother, "Nana," the persons residing in or frequenting Mother's home (factor twelve)[11] who coached the Child into taking a position against Father, finding that they should not have influence over the Child's life on a daily basis. With respect to the recommendations of the GAL, the court found that increased visitation and counseling with Father would not work due to Mother's "complete inability to co-parent" and given the "poisonous" environment created by the maternal grandmother, "Nana," and Mother's husband, Brent, towards Father.

Upon a thorough review of the record, we conclude that the evidence preponderates in favor of the trial court's findings of fact and that the trial court properly analyzed the best interest factors in light of the unique circumstances of this case and concluded that a

---

[11] Tennessee Code Annotated 36-6-106(a) factor twelve is "the character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child[.]"

change of custody was necessary to ensure that Mother did not continue withholding the Child from Father. As noted above, Mother testified four times during her deposition and four more times in her testimony at trial that she **would not** comply with the court's orders as she believed that the Child had been abused while visiting with Father. The evidence preponderates in favor of the court's finding that this this belief was "patently unreasonable" as it was undisputed that all three of Mother's DCS reports against Father were unfounded and the Child admitted at trial that he had never run away from home or been locked in his room while visiting with Father. Despite a complete lack of evidence that the Child was ever harmed at Father's, Mother continually testified that she would not comply with the court's orders. The proof supports the trial court's finding that Mother was unlikely to change her conduct and comply with future visitation orders.

Mother also contends that the trial court erred in imposing supervised visitation without the aid of expert testimony and without conducting an analysis under Tennessee Code Annotated § 36-6-301 or -406.

As this court has explained:

Tennessee Code Annotated section 36-6-301 allows for supervised visitation on a finding that visitation is "likely to endanger the child's physical or emotional health," or that the parent has "physically or emotionally abused the child." Tenn. Code Ann. § 36-6-301. Supervised visitation may also be warranted consistent with findings pursuant to Tennessee Code Annotated § 36-6-406.[12] Finally, a trial court may also consider the child's safety and any risk of substantial harm posed by a parent in a best interest analysis under Tennessee Code Annotated § 36-6-106.

*Allen v. Allen*, No. W2016-01078-COA-R3-CV, 2017 WL 908319, at *12 (Tenn. Ct. App. Mar. 7, 2017).

In considering the best interest factors, the trial court found that Mother had attempted to altogether sever the relationship between Father and the Child by, *inter alia*, withholding the Child from Father for over a year without good cause and permitting members of her family to coach the Child on how to act and react when visitation was attempted, and thereafter, how to testify at trial so that he would not have to see Father again. And as the trial court correctly found, such severe alienation of the Child from Father

---

[12] Pursuant to Tennessee Code Annotated § 36-6-406, a court may preclude or limit the provisions of a parenting plan if the court finds after a hearing that certain limiting factors exist, including if "[a] parent has withheld from the other parent access to the child for a protracted period without good cause[.]" Tenn. Code Ann. § 36-6-406(d)(6). Our Supreme Court has clarified that "since [the § 36-6-406] factors are substantially similar to those of 36-6-106(a), the omission of this analysis does not change the result nor is it likely to do so in most instances." *Armbrister*, 414 S.W.3d at 706.

has caused harm to the Child. Having reviewed the record, we conclude that the evidence preponderates in favor of the trial court's findings, which fully support its conclusion on this issue.

Based upon our review of the entire record and the foregoing findings, we find no abuse of discretion in the trial court's modification of the Parenting Plan. Accordingly, we affirm the modification of the Parenting Plan in all respects.

## II. CRIMINAL CONTEMPT

Mother contends that the trial court erred by finding her guilty on seventy-one counts of criminal contempt for willfully violating the Parenting Plan. She also contends that the sentence imposed for her criminal contempt was excessive. For his part, Father contends that the sentence was not sufficiently severe to emphasize the seriousness of the contempt.

The willful disobedience of "any lawful writ, process, order, rule, decree, or command" is punishable as criminal contempt. Tenn. Code Ann. § 29-9-102(3). As noted in *Nichols v. Crockett*, No. E2016-00885-COA-R3-CV, 2017 WL 4051083 (Tenn. Ct. App. Sept. 13, 2017):

> Criminal contempt proceedings are designed to "vindicate the court's authority and maintain the integrity of its orders;" thus, such proceedings are "generally punitive rather than remedial in nature." *Reed v. Hamilton*, 39 S.W.3d 115, 118 (Tenn. Ct. App. 2000). "A party who is in criminal contempt cannot be freed by eventual compliance." *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000). We will reverse a criminal contempt conviction "if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." *Lee v. Lee*, No. M2014-01911-COA-R3-CV, 2017 WL 1205913, at *9 (Tenn. Ct. App. Mar. 31, 2017) (quoting Tenn. R. App. P. 13(e)).

> A proceeding for criminal contempt is required to comply with Rule 42(b) of the Tennessee Rules of Criminal Procedure. *Long v. McAllister-Long*, 221 S.W.3d 1, 12 (Tenn. Ct. App. 2008). Rule 42(b) "requires that a party facing a criminal contempt charge be given explicit notice that they are charged with criminal contempt and must also be informed of the facts giving rise to the charge." *Id.* Rule 42(b) reads as follows:

> *Content of Notice.* The criminal contempt notice shall:

> (A) state the time and place of the hearing;

> > (B) allow the defendant a reasonable time to prepare a defense; and
>
> > **(C) state the essential facts constituting the criminal contempt charged and describe it as such.**
>
> Tenn. R. Crim. P. 42(b)(1)(A)–(C) (emphasis added). The sufficiency of a contempt notice under Rule 42(b) of the Tennessee Rules of Criminal Procedure is a question of law reviewed de novo. *Sprague v. Sprague*, No. E2012-01133-COA-R3-CV, 2013 WL 3148278, at *3 (Tenn. Ct. App. Jun. 18, 2013); *State ex rel. Farris v. Bryant*, No. E2008-02597-COA-R3-CV, 2011 WL 676162, at *5 (Tenn. Ct. App. Feb. 24, 2011).

*Id.* at *5 (emphasis added).

The "essential facts" constituting the contempt charged are those which, at a minimum:

> (1) allow the accused to glean that he or she is being charged with a crime, rather than being sued by an individual, (2) enable the accused to understand that the object of the charge is punishment—not merely to secure compliance with a previously existing order, and (3) sufficiently aid the accused to determine the nature of the accusation, which encompasses the requirement that the underlying court order allegedly violated by the accused is itself clear and unambiguous.

*Long v. McAllister-Long*, 221 S.W.3d 1, 13–14 (Tenn. Ct. App. 2008).

In the instant case, the trial court found Mother in criminal contempt for seventy-one counts of violating the Parenting Plan's visitation schedule by willfully obstructing Father's visitation. Because these acts took place outside of the presence of the court, Mother was entitled to notice in accordance with Tennessee Rule of Criminal Procedure 42(b). *See State v. Maddux*, 5 S.W.2d 819, 821 (Tenn. 1978) ("Indirect contempt is based upon acts not committed in the presence of the court, and may be punished only after the offender has been given notice, and the opportunity to respond to the charges at a hearing.") (citing *Johnson v. Mississippi*, 403 U.S. 212, 91 S. Ct. 1778, 29 L.Ed.2d 423; *Cooke v. United States*, 267 U.S. 517, 45 S. Ct. 390, 69 L. Ed. 767 (1925)).

Mother contends that she did not receive the "essential facts" required under Rule 42(b) because she was not notified of the specific number of contempt charges that she was facing. Because Father's contempt petition "made only three general allegations of contempt," Mother claims that it was "insufficient to put [her] on notice that she could be found guilty of seventy-one counts for not making the child share residentially with the

father on seventy-one occasions." Although not exactly stated as such, Mother appears to suggest that in order to receive proper notice of the contempt charges against her, Father needed to amend his petition to list each of the seventy-one contemptuous acts by date. Having considered the record before us, we find this argument disingenuous just as we did in *Trezevant v. Trezevant*, No. W2023-00682-COA-R3-CV, 2024 WL 4369252 (Tenn. Ct. App. Oct. 2, 2024).

In *Trezevant*, while the identification of the contemptuous acts in the wife's contempt notice against the husband was less than detailed, as is the case here, we found that the subsequent filings and court proceedings provided the husband with the essential facts as required by Tennessee Rule of Criminal Procedure 42(b). As we explained:

> Husband's argument that he did not receive proper notice is disingenuous given: (1) Wife's detailed response to his motion for more definite statement; (2) his counsel's statement that Husband understood how Wife would proceed with the criminal contempt and that he was "in a position, as it relates to that issue, to proceed"; (3) Husband's waiver of a formal reading of the charges against him; and (4) Wife's trial memorandum explicitly outlining the criminal contempt charges against Husband. We conclude that the foregoing provided Husband with more than "adequate" notice of the criminal contempt charges pending against him.

*Id.* at *14 (citations omitted); *see also Nichols*, 2017 WL 4051083, at *6 (noting that, while the allegations in the father's contempt petition were sufficient, the father "gave *additional notice*" in two separate pleadings filed approximately two months prior to the hearing).

Here, in his contempt petition, Father explicitly requested that Mother be held in criminal contempt for willfully violating the Parenting Plan by "discussing the parties' case with the minor child and/or in the presence of the minor child in three ways[,]" "fail[ing] to encourage visitation of the minor child with his Father since Father has not visited . . . at all since **October, 2022**[,]" and "fail[ing] to engage in a full and complete discussion and a joint decision-making agreement with the Father." (emphasis in original). To be fair, the petition does not list each date Mother failed to comply with the visitation schedule in the Parenting Plan or the total number of times she allegedly violated the Parenting Plan. Nevertheless, the Parenting Plan afforded Father visitation each Wednesday evening through Thursday morning and every other weekend and Mother admitted that Father had not had visitation with the Child since October 6, 2022. Thus, Mother had notice of the exact dates and the number of times she deprived Father of his scheduled visitation.

Moreover, Father's counsel filed with the court a pre-trial document entitled "TRIAL ISSUES," which specifically identified the issues to be tried. Of those issues, it specifically listed "1) Criminal Contempt of [Mother]." It further stated that one of the issues to be tried pertained to the fact that Mother "does not abide by Court's Orders as

contained in Permanent Parenting Plan . . . duly entered April 19, 2017," and specifically "b) She fails to encourage visitation of the minor child with the Father resulting in the Father's not having regular visitation with the minor child . . . at all since October, 2022."

Thus, although Father's contempt petition did not identify the exact dates or the total times Mother failed to afford Father his scheduled visitation, Mother was aware of the dates (every Wednesday night through Thursday morning and every other weekend) and was on proper notice that Father was seeking to have her held in contempt for each event, the total of which, as stated in the filing, was "sixty-nine (69) times" as of the filing of the statement of issues.[13] Based on the foregoing, we conclude that Mother was provided with the "essential facts" constituting the failed visitation contempt charges.

Mother also claims that she did not "willfully" violate the visitation schedule because she made "some efforts" to comply by bringing the Child to the designated drop off point each week. A criminal act is considered "willful" when a person "'acts intentionally with respect to the nature of the conduct . . . when it is the person's conscious objective or desire to engage in the conduct[.]'" *In re Sneed*, 302 S.W.3d 825, 826 n.1 (Tenn. 2010) (quoting Tenn. Code Ann. § 39-11-302(a) (2006)).

As noted above, Mother repeatedly testified that she would not comply with the court's orders based upon her belief that the Child had been abused at Father's home. Mother's testimony makes clear that her failure to comply with the visitation schedule was willful. Thus, we agree with the trial court's finding that Mother's "continued and ongoing choices in not making the child share residentially with Father have been deliberate and are a product of free will acts on her part."

Arguing in the alternative, Mother contends that the trial court's sentence for her criminal contempt was excessive. For his part, Father contends that the sentence should have been greater to emphasize the seriousness of Mother's criminal contempt.

Upon finding Mother guilty of seventy-one counts of criminal contempt, the trial court sentenced Mother to serve three weekends in jail.[14] "[I]f a party knowingly engages in contemptuous conduct, sanctions are appropriate, including incarceration, if justified by the circumstances." *Simpkins v. Simpkins*, 374 S.W.3d 413, 422 (Tenn. Ct. App. 2012)

---

[13] It is undisputed that the Child had missed seventy-one visitations by the first date of trial on October 24, 2023.

[14] The trial court originally sentenced Mother to "concurrent 10-day terms for all seventy-one counts except for 60 days in jail for her criminal contempt of a valid Court Order (six counts out of seventy-one counts times ten days for each count to run consecutively)." The court then suspended all of the 60-day sentence less the service of three weekends in jail. As a condition of the suspension, Mother was ordered to strictly adhere to the court's orders going forward.

(citing Tenn. Code Ann. § 29-9-102; Tenn. Code Ann. § 29-9-103(b)). As we have found immediately above, Mother's obstruction of Father's visitation was in willful violation of the Parenting Plan and should be sanctioned. Tennessee Code Annotated § 29-9-103(b) limits the sanctions that a court may impose for a finding of criminal contempt:

> (a) The punishment for contempt may be by fine or by imprisonment, or both.
>
> (b) Where not otherwise specially provided, the circuit, chancery, and appellate courts are limited to a fine of fifty dollars ($50.00), and **imprisonment not exceeding ten (10) days**, and, except as provided in § 29–9–108, all other courts are limited to a fine of ten dollars ($10.00).

(Emphasis added).

The record before us clearly establishes seventy-one acts of criminal contempt. Although the maximum jail sentence that Mother could have faced under § 29-9-103(b) was 710 days in jail, the trial court imposed a sentence of six concurrent ten-day terms in jail, suspending all but three weekends conditioned upon Mother's compliance with the court's orders. The trial court found that this sentence was "absolutely necessary to protect the sanctity of the Court's Orders and to discourage unilateral willful disobedience of a valid Court Order." We find no error with the trial court's reasoning or judgment.

For the reasons set forth above, we affirm the trial court's findings of seventy-one counts of contempt for Mother's willful violation of the Parenting Plan and the sentence imposed for Mother's contempt.

### III. Father's Attorney's Fees on Appeal

Father seeks his attorney's fees on appeal pursuant to Tennessee Code Annotated § 36-5-103(c).[15] Tennessee Code Annotated § 36-5-103(c) provides:

> (c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in

---

[15] Father alternatively contends that this court should award his attorney's fees pursuant to Tennessee Code Annotated § 27-1-122, which authorizes this court to award damages, including attorney fees incurred by an appellee, against an appellant who brings a frivolous appeal. *Howard Johnson, Inc. v. Holyfield*, No. W2008-02405-COA-R3-CV, 2009 WL 1349197, at *5 (Tenn. Ct. App. May 14, 2009) (citing Tenn. Code Ann. § 27-1-122). A frivolous appeal is one that "has no reasonable chance of success" or is "so utterly devoid of merit as to justify the imposition of a penalty." *Stokes v. Stokes*, No. M2018-00174-COAR3-CV, 2019 WL 1077263, at *10 (Tenn. Ct. App. Mar. 7, 2019). Although we have affirmed the trial court's ruling, we do not find Mother's appeal to be so devoid of merit as to warrant awarding damages for frivolous appeal.

any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

"Tenn. Code Ann. § 36-5-103(c) (Supp. 2004) vests in this court the discretionary authority to award these fees and costs in proper cases." *Shofner v. Shofner*, 181 S.W.3d 703, 719 (Tenn. Ct. App. 2004)). Exercising our discretion, we conclude that Father is entitled to his reasonable attorney's fees incurred in successfully defending this appeal. We remand this case to the trial court to determine the appropriate amount of attorney's fees to which Father is entitled and to enter judgment accordingly.

## CONCLUSION

The judgment of the trial court is affirmed. This matter is remanded to the trial court for a determination of reasonable and necessary attorney's fees and costs incurred by Father. Costs of appeal are assessed against the appellant, Brandy Leigh Frame Taylor (now Tipper).

_____
FRANK G. CLEMENT JR., P.J., M.S.